UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**ISAIAH FARNSWORTH,**<br><br>Defendant. | Case No. 23-cr-00004 (APM) |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Isaiah Farnsworth to an upper guidelines sentence of seven months' incarceration, three years of supervised release, $11,860 in restitution, and the mandatory $100 special assessment.[1]

**I.      INTRODUCTION**

The defendant, Isaiah Farnsworth, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in

---

[1] As explained further below, the government believes that the correct guidelines range for this case is two to eight months' incarceration rather than the previously agreed upon eight to fourteen months' incarceration.

1

losses.[2]

As explained herein, a sentence of seven months is appropriate in this case because on January 6, Farnsworth: (1) was one of the first rioters who entered the U.S. Capitol through the breached Parliamentarian Door; (2) joined several other rioters in efforts to break a locked office door; (3) rammed the door with so much force that he and the other rioters caused $9,860 in damages; (4) his actions allowed rioters to enter and ransack a private office; and (5) rather than express remorse, Farnsworth posted videos on Facebook that glorified his actions on January 6. Farnsworth also has a significant criminal history—thirteen adult criminal convictions, including a felony conviction in 2000 for sexually assaulting a child, and two convictions for domestic violence in 2018.

Farnsworth joined the initial wave of rioters entering the U.S. Capitol through the breached Parliamentarian Door. Almost immediately upon entry, Farnsworth joined several other rioters in their efforts to break an office door. He rammed the door with his shoulder, throwing all his body weight into the door. When that effort failed, he pushed with the others. Eventually, they succeeded, reducing the top of the door to splinters, causing $9,860 in damages, and allowing a swarm of rioters to enter the office. Later that day, Farnsworth posted a video on Facebook, in

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol totaled $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

which he can be heard stating: "We have a right to be at our house . . . we have a right to be on our lawn . . .we have a right to bring our grievances to the government . . . never, never be passive about such a powerful government any longer." Two days after the riot, Farnsworth wrote the following on his Facebook: "This battle will come to you no matter what!! There is NO going back to life as usual."

The government recommends that the Court sentence Farnsworth to seven months of incarceration, the upper range of the advisory Guidelines range of two to eight months, which the government submits is the correct Guidelines calculation. An upper Guidelines sentence reflects the gravity of Farnsworth's conduct on January 6, as well as his extensive criminal history and demonstrated unwillingness to abide by the law.

**II.    FACTUAL BACKGROUND**

    **A.    The January 6, 2021 Attack on the Capitol**

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 30, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

    **B.    Farnsworth's Role in the January 6, 2021 Attack on the Capitol**

Isaiah Farnsworth, a 44-year-old currently living in Tennessee, participated in the January 6 attack on the Capitol. Before January 6, 2021, Farnsworth drove from his home in Broomfield, Colorado to Washington, D.C. The purpose of his trip was to protest Congress's certification of the Electoral College. On the morning of January 6, Farnsworth gathered with other rioters near

the National Mall before approaching the U.S. Capitol grounds.

Farnsworth eventually made his way through the mob of rioters, past the barriers, beyond the lower west front, and to the upper west terrace of the Capitol building. There, he stopped to take pictures of the crowd on the west front of the Capitol grounds. He posted at least one of these pictures to his Facebook account. He also recorded a video of the crowd, which he also posted to Facebook. In that video, he can be heard saying: "We have a right to be at our house . . . we have a right to be on our lawn . . . we have a right to bring our grievances to the government . . . never, never be passive about such a powerful government any longer."

Farnsworth eventually walked over to the exterior of the Senate Wing and waited for his opportunity to enter the building. While he waited, he took a video of the crowd just before the breach of the Senate Wing Doors. He also encouraged the restless crowd to join him in chanting "Let us in!"



*Image 1: Farnsworth filming near the Senate Wing Door*



*Image 2: Farnsworth chanting near the Senate Wing Door*

Farnsworth was present when a rioter began violently bashing in the Parliamentarian Door. After the rioter bashed the door's window with a metal pole and stuck his arm through the window to open the door, rioters rushed into the building.

Farnsworth entered through the Parliamentarian Door shortly after its breach at approximately 2:44 p.m. As he entered, the building was loud; sirens were blaring, rioters were yelling and screaming, and rioters were intent on destruction. Farnsworth was one such rioter. Almost immediately upon entering the building, Farnsworth spotted other rioters attempting to bash in an interior office door, S-131, and beelined over to them. He joined the effort, throwing all his weight against the door. He then backed up and gathered himself, watching as one of the rioters used a metal stand to bash the door. He then joined the effort again, this time throwing his weight behind several rioters as they rammed the door four times. Although the U.S. Capitol surveillance footage ("CCV") does not have sound, Farnsworth can be seen shouting seemingly encouraging words at the other rioters as they worked together to break down the door.



*Image 3 (still from Exhibit 1 at 37 sec.): Farnsworth coordinating with other rioters to break down the door to S-131*

Shortly after Farnsworth took a break from his efforts, other rioters succeeded in breaking the office door open, causing approximately $9,860 in damage to the door. Rioters proceeded to swarm into the office, causing additional damage to interior windows of up to approximately $4,000, and various damage to property within the office.

Farnsworth ventured inside the office for several minutes, exited, and then entered the office for a second time. According to his post-arrest interview statement, he did not venture further into the Capitol because there was a "police standoff" down the hall.

Approximately five minutes after he entered the Capitol, he exited the building through the Parliamentarian Door. Ironically, as he walked out of the office and through the doors, which he

had mere minutes prior assisted in breaking open through brute force, he repeatedly yelled at the other rioters to "respect our house" and cautioned against breaking or stealing anything. Unfortunately, Farnsworth failed to practice what he preached.

Later in the evening of January 6, Farnsworth gathered with others believed to have traveled to Washington, D.C. to protest the certification of the Electoral College. In a video that Farnsworth posted to his Facebook page, an individual can be heard asking Farnsworth if he went to the Capitol building. Farnsworth replied, "Yes sir. You know that's my house. I told them to respect my house, don't break nothing, don't steal nothing."

Several days after the riot, on January 8, Farnsworth posted the following message on his Facebook page alongside several photos and videos from his time in Washington, D.C.: "The battle will come to you no matter what!! There is NO going back to life as usual. EVERYONE needs to get over whatever form of denial they have and acknowledge the tyranny that is building a cage. If we don't all stand United together we will hang separately. What will we tell our children? What will you do? Will you keep your head down and pretend we aren't supposed to do anything?? They have already ruined so many of our livelihood, so do you really think it will return to normal- denial is nit [sic] a river in Egypt. WAKE UP!! DC truly is a swamp with a dark underbelly." And on January 10, he posted this message to Facebook: "We are at war!! People WAKE UP WAKEUP!!!!!"

### C. Farnsworth's Post-Arrest Interview

Following his arrest, Farnsworth sat down for a voluntary interview with several FBI agents. He exhibited anger and resentment throughout the interview, raising his voice at the agents

8

on more than one occasion. He told the agents that he went to the Capitol building on January 6 to see his friends, including Donald Trump, Representative Lauren Boebert, and others. He refused to name those that he traveled with.

Farnsworth admitted to entering the Capitol. But he minimized his conduct, telling the agents that while he knew certain areas of the Capitol were not public, he thought the area inside the Parliamentarian Door was open to the public and that he had a "right" to be there. He said this while also admitting that he did not go further inside the building because he saw a "police standoff" down the hall from the Parliamentarian Door entrance. He also neglected to mention his part in breaking down the S-131 office door.

### III.  THE CHARGES AND PLEA AGREEMENT

On January 4, 2023, a federal grand jury returned an indictment charging Farnsworth with seven counts, including, (1) Destruction of Government Property, 18 U.S.C. § 1361; (2) Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1); (3) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2); (4) Engaging in Physical Violence in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(4); (5) Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); (6) Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F); and (7) Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). ECF No. 12. On May 4, 2023, Farnsworth was convicted of violating 18 U.S.C. § 1361 based on a guilty plea entered pursuant to a plea agreement.

## IV.  STATUTORY PENALTIES

Farnsworth now faces sentencing on Count 1 of the Indictment, Destruction of Government Property, 18 U.S.C. § 1361.

As noted by the plea agreement and the Presentence Report ("PSR") issued by the U.S. Probation Office, the defendant faces up to 10 years of imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100.

## V.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). According to the PSR, the U.S. Probation Office calculated Farnsworth's adjusted offense level under the Sentencing Guidelines as follows:

Count One: 18 U.S.C. § 1361

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(2) | Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(1)(B) | Special Offense Characteristics | 2 |
| U.S.S.G. § 3A1.2(a) | Victim Related Adjustment | 3 |
| U.S.S.G. § 3E1.1(a) | Acceptance of Responsibility | -2 |
| **Total Adjusted Offense Level** | | **9** |

*See* PSR ¶¶ 34–43.

The Plea Agreement between the parties reflected the same calculation. *See* Plea Agreement at ¶¶ 5(A). However, after further internal discussions, the government now believes that this calculation is incorrect. That is because the victim-related adjustment under U.S.S.G. § 3A1.2(a) is inapplicable to a violation of 18 U.S.C. § 1361 in this context, where the victim of the

10

crime is the Architect of the U.S. Capitol. So, the government contends that Farnsworth's adjusted offense level is as follows:

Count One: 18 U.S.C. § 1361

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(2) | Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(1)(B) | Special Offense Characteristics | 2 |
| U.S.S.G. § 3E1.1(a) | Acceptance of Responsibility | -2 |
| | **Total Adjusted Offense Level** | 6 |

The U.S. Probation Office correctly calculated Farnsworth's criminal history as category III, which is not disputed. PSR ¶ 71. Accordingly, based on the government's calculation of Farnsworth's total adjusted offense level, after acceptance of responsibility, at 6, Farnsworth's Guidelines imprisonment range is 2 to 8 months' imprisonment.

## VI. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A. Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Farnsworth's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Alongside other rioters, Farnworth broke through a locked wooden office door, causing extensive damage to the door and allowing rioters to pour into the previously locked office. The nature and circumstances of Farnsworth's offense were of the utmost seriousness, and fully support the government's recommended sentence of seven months'

11

incarceration, three years of supervised release, $11,860 in restitution, and the mandatory $100 special assessment.

### B. The History and Characteristics of the Defendant

Farnsworth is an electrician at a company based in White House, Tennessee, and a father of two. PSR ¶¶ 93, 117. The defendant has a significant and violent history of arrest and conviction which weighs in favor of a lengthy period of incarceration.

Farnsworth's involvement with the criminal justice system began, to the government's knowledge, at age fourteen. Before age eighteen, he managed to rack up fourteen convictions, with sentences ranging from fines to jail time. PSR ¶¶ 44–57.

Between ages eighteen and twenty-one, Farnsworth fared no better, managing to accrue another nine convictions. PSR ¶¶ 58–66. That period was capped off with a conviction for felony third-degree sexual assault in Evanston, Wyoming. PSR ¶ 66 In that case, it was alleged that Farnsworth, then twenty years old, performed oral sex and ejaculated on the three-year-old daughter of his then-wife. *Id.* Farnsworth entered a no-contest plea to one of the charged assaults. He was sentenced to a minimum sentence of seven years (later reduced to 2.5 years minimum) and a maximum sentence of fifteen years' incarceration. *Id.* He ultimately served a term of incarceration from 2000 until 2010 and was briefly re-incarcerated for a parole violation in 2011. PSR ¶ 92.

In 2018, eight years after his release from prison, Farnsworth racked up another four convictions:

- In March 2018, Farnsworth was charged with Criminal Mischief, False Imprisonment, and Obstructing a Peace Officer. The listed victim was his wife.

12

> Farnsworth pleaded guilty to one count of Criminal Mischief, as an act of domestic violence, and was sentenced to 1 year of probation. That term of probation was extended by one year and ultimately terminated on December 21, 2020. PSR ¶ 67.

- In April 2018, Farnsworth was charged with Criminal Mischief. The listed victim was a woman who was not his wife. He was sentenced to one year of probation, to run consecutively with the earlier conviction. PSR ¶ 69.

- In June 2018, Farnsworth was charged with Felony Menacing (Real/Simulated Weapon), False Imprisonment, Harassment, and Assault 3rd Degree (Knowingly/Recklessly Cause Injury). The listed victim was his wife. He pleaded guilty to the Assault 3rd Degree count and received two years of probation. His term of probation was terminated on December 23, 2020.

- In June 2018, Farnsworth was charged with a misdemeanor and several driving infractions. He pleaded to a single infraction and received a sentence of a fine and costs. PSR ¶ 68.

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a series of violent offenses. The defendant's criminal history demonstrates a propensity towards violence that is concerning, particularly in light of his self-reported "fun" and happy childhood. *See* PSR ¶ 90. The defendant's history and characteristics, including his history of arrest and conviction for violent assaults, weigh heavily in favor of a top of Guidelines sentence.

    **C.**    **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Farnworth's criminal conduct on January 6 was the epitome of disrespect for the law.

D.    **The Need for the Sentence to Afford Adequate Deterrence** *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, Farnsworth has a criminal history category of III, reflecting a pattern of assaultive behavior. *See* Section VI(B) *supra.* Second, although Farnsworth has now accepted responsibility for his actions on January 6, 2021, his social media statements after January 6 were those of a man girding for further violence. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Farnsworth's statements that the "battle" will come to us all, that "[t]here is NO going back to life as usual," and that "[w]e are at war" demonstrate that Farnsworth's sentence must be sufficient to provide specific

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

14

deterrence from committing future crimes of violence, particularly considering his history of recidivism and convictions of violent assault.

E.   **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.   **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United*

*States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

To date, few defendants have been sentenced for a stand-alone violation of 18 U.S.C. § 1361. In *U.S. v. Hunter Ehmke*, 21-CR-029 (TSC), the defendant kicked and punched out three exterior windows of the Capitol Building adjacent to the Rotunda doors on the east side of the building. Unlike Farnsworth, the defendant had never been arrested before January 6. He

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

ultimately received four months' incarceration, 36 months' supervised release, and $2,821 in restitution.

In *U.S. v. Troy Elbert Faulkner*, 21-CR-126 (BAH), the defendant kicked in several windowpanes on the west side of the Capitol building. That defendant, like Farnsworth, had a criminal history category of III. The defendant received a sentence of five months' incarceration, 36 months' supervised release, and $10,560 in restitution. But Faulkner's criminal history, while lengthy, was considerably less violent than Farnsworth's.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have a straightforward application here. The Architect of the Capitol has estimated that the cost of the damage to the interior S-131 office door was $9,860. The parties

agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Farnsworth must pay $11,860 in restitution, which reflects in part the role Farnsworth played in the riot on January 6.[6] Plea Agreement at ¶ 12. The riot at the United States Capitol had caused approximately $2,923,080.05 in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. Farnsworth's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.

## VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of seven months' incarceration, three years of supervised release, $11,860 in restitution, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:  */s/Madison Mumma*
Madison Mumma
Trial Attorney (Detailee)
N.C. Bar No. 56546
601 D. St., NW
Washington, D.C. 20001
madison.mumma2@usdoj.gov
202-431-8603

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

**CERTIFICATE OF SERVICE**

On this 30th day of August 2023, a copy of the foregoing was served on counsel of record for the defendant via the Court's Electronic Filing System.

/s/ *Madison Mumma*
Madison Mumma
Trial Attorney